**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0685n.06
Filed: September 8, 2006

**No. 05-3974, 05-4022**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

ALPHA TELECOMMUNICATIONS, INC.,

    **Plaintiff-Appellant,**

v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

    **Defendant-Appellee.**

                                  /

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO**

---

BEFORE:    MOORE, CLAY, and GRIFFIN, Circuit Judges.

    **CLAY, Circuit Judge.** Plaintiff, Alpha Telecommunications, Inc. ("Alpha"), appeals a July 8, 2005 order of the United States District Court for the Northern District of Ohio, denying Plaintiff's motion for summary judgment on its breach of contract and quantum meruit action and granting summary judgment *sua sponte* in favor of Defendant, International Business Machines Corp. ("IBM"). IBM cross-appeals the district court's order, arguing that the district court abused its discretion in denying IBM's motion for sanctions under Rule 11. For the reasons set forth below, we **AFFIRM** the order of the district court.

# I.
# BACKGROUND

The dispute in this case arises out of a contract between Alpha and IBM, which both parties entered into for the purpose of helping IBM obtain service contracts with schools through the federal E-Rate program.

## A.    The E-Rate Program

In February 1996, Congress enacted the Telecommunication Act of 1996, Pub. L. No.104-104, 110 Stat. 56, at revising, among other things, the Universal Service System.  E-Rate, Federal Communications Commission, http://www.fcc.gov/learnnet, (last visited May 25, 2001).  Prior to 1996, the Universal Service System was a program that set below cost rates for telecommunications services in under-serviced rural and residential areas, and offset the reduced rates by setting above cost rates for telecommunications services in other areas.  *Id.*  The 1996 amendments expanded the types of discounted services available through the program, as well as the types of customers eligible for relief.  *Id.*  In particular, the amendments rendered schools and libraries eligible for discounted rates on telecommunications and internet services.  *Id.*  The schools and libraries program is commonly referred to as "E-Rate" and is administered by the Universal Service Company ("USAC"), under the direction of the Federal Communications Commission ("FCC").  Overview of the Schools and Libraries Program, USAC, http://www.universalservice.org/sl/about/overview-program.aspx, (last visited May 25, 2006).

In order for a school or library to participate in E-Rate, the school or library must engage in a highly regulated application process.  *See id.*  First, the school or library must create a "technology plan" and have the plan approved by a certified entity.  Step 2: Develop a Technology Plan, USAC,

http://www.universalservice.org/sl/applicants/setp02, (last visited May 25, 2006). Next, the school or library must file "Form 470" with the USAC to begin the competitive bidding process. The USAC posts the school or library's request for services online. Step 3: Open a Competitive Bidding Process, USAC, http://www.universalservice.org/sl/applicants/step03, (last visited May 25, 2006). Thereafter, the school or library must wait 28 days before selecting a service provider. *Id.* In selecting a service provider, schools and libraries must make price the primary selection criteria. Step 4: Select the Most Cost-Effective Service Provider, USAC, http://www.universalservice.org/sl/applicants/step04, (last visited May 25, 2006). After selecting a provider, applicants must calculate their discount rate by using "Form 471," and submit Form 471 to the USAC. Step 5: Calculate the Discount Level, USAC, http://www.universalservice.org/sl/applicants/step05, (last visited May 25, 2006). The USAC will review Form 471 and determine eligibility. Step 7: Submit Application for Support (Form 471), USAC, http://www.universalservice.org/sl/applicants/step07, (last visited May 25, 2006).

**B.      IBM's Contract with Alpha**

On May 25, 1999, IBM and Alpha entered into a CSA, which was to govern the terms of their relationship. The CSA specified that Alpha would provide "deliverables" and "services" to IBM and that such "deliverables" and "services" would be defined in a future SOW. The CSA also contained termination provisions both for the CSA itself and SOW or Work Authorizations ("WA"). The CSA's termination provision for SOWs reads as follows:

*3.3      Termination of a SOW or WA*

3

[IBM] may terminate a SOW or WA with Cause effective immediately or without Cause on sixty (60) days written notice. Upon termination, in accordance with [IBM]'s written direction, [Alpha] will immediately: (I) cease work; (ii) prepare and submit to [IBM] an itemization of all completed and partially completed Deliverables and Services; (iii) deliver to [IBM] Deliverables satisfactorily completed up to the date of termination at the agreed upon Prices in the relevant SOW; and (iv) deliver upon request any work in progress. In the event [IBM] terminates without Cause, [IBM] will compensate [Alpha] for the actual and reasonable expenses incurred by [Alpha] for work in process up to and including the date of termination provided [Alpha] uses reasonable efforts to mitigate [IBM]'s liability under this Subsection by, among other actions, accepting the return of, returning to its suppliers, selling to others, or otherwise using the canceled Deliverables (including raw materials or work in process) provided such expenses do not exceed the Prices.

(J.A. at 63.)

The particular SOW at issue in this case was entered into on January 7, 2002. The SOW specified that Alpha would help IBM prepare bids on request for services from school districts in IBM's Western and Southwestern regions. In particular it specified that Alpha would review school districts' requests and determine the applicable rates and discounts under the E-Rate program allowing IBM to properly price its bids. The SOW further specified an estimated schedule for Alpha's work, stating:

**1.5 Estimated Schedule**

Alpha Telecommunications, Inc., will perform services in this Statement of Work as required to meet customer requirements. For this Statement of Work the Start Date will be December 1, 2001, and the Termination Date shall be December 1, 2003.

(J.A. at 17-18.)

Finally, the SOW sets forth fees. The fees provision provided that Alpha would be entitled to a percentage of IBM's fees from the school districts provided those districts were funded by the School and Libraries Division ("SLD") of the USAC. The payment schedule includes the following

statements reiterating the conditional nature of Alpha's entitlement to payment: (1) "Total fees wills will apply only to school districts which are funded by the Schools & Libraries Division (SLD)," and (2) "If portions of the [SOW] are not funded or cannot be completed due to delayed release of funds, Alpha Telecommunications , Inc. [sic] payment will be delayed until funding occurs or reduced accordingly." (J.A. at 18.) Finally, the Key Assumptions section of the SOW also states that the SOW is "contingent on funding confirmation from the Schools and Libraries Division (SLD) of the [USAC]." (J.A. at 16.)

### C.     The Dispute

Alpha started work under the SOW in January 2002. Alpha's work consisted of assisting IBM in preparing bids on request for services for the following sixteen school districts: Albuquerque; Boor Hill; Canntillo; Clint; Dallas; Donna; El Paso; Forth Worth; Galena Park; Gallup; Houston; NETC; New Orleans; Oakland; OK City; and Ysleta. In particular, Alpha would review the districts' request forms (Form 470) and applications for funding (Form 471) and determine which services were eligible for funding. It is unclear from the record which of these school districts subsequently accepted IBM's bids and applied to the SLD for funding. It is clear, however, that the SLD denied funding to all of the districts that applied. *See In re Request for Review of the Decision of the Universal Service Administrator by Ysleta Independent School District*, 18 F.C.C.R. 26407 (2003). The districts and IBM appealed the denials to the FCC. *Id.* On December 8, 2003, the FCC issued an order affirming the SLD's denial of funding. *Id.*

On February 25, 2004, IBM employee, Mike Pratt, called Alpha's attorney, Nathaniel Hawthorne, and informed Hawthorne that the SOW had expired at the end of December 2003 and

that IBM would not be renewing it. In response, Alpha sent IBM an invoice for $16,135,053.97 for worked performed under the SOW. Alpha allegedly performed 90% of the work called for the SOW. IBM refused to pay on the ground that SLD had not approved the funding, and therefore, IBM did not owe Alpha any fees under the SOW.

On March 11, 2004, Alpha filed suit in federal district court, alleging that IBM breached the CSA by terminating the SOW without cause. IBM denied that it terminated the SOW, and argued that the SOW expired on December 1, 2003, as set forth in the SOW's estimated schedule. Additionally, IBM moved for sanction under Rule 11 on the ground that even if it had breached the SOW, Alpha was not entitled to damages under the SOW and thus Alpha's suit was frivolous. In response, Alpha argues that the SOW did not expire because the FCC extended the SLD's funding period for E-Rate grants, or "project year," from December 8, 2003 until April 23, 2004. Alpha contends that the FCC's extension of the funding period altered the SOW's termination date.

The district court assumed that IBM had terminated the SOW for the purposes of this action and granted summary judgment in favor of IBM on the ground that Alpha had not demonstrated it was entitled to damages under the SOW. According to the district court, SLD funding was a condition precedent to payment under the SOW, and IBM never received such funding. Alpha appeals this determination, arguing that the district court misconstrued its claim; Alpha states that it is not claiming the right to payment under the SOW but damages under the CSA for IBM's without-cause-termination of the SOW. IBM cross appeals the district court's order denying Rule 11 sanctions.

## II.
## DISCUSSION

### A.    Summary Judgment

#### 1.    Standard of Review

This appeal arises both in the context of a grant of summary judgment in favor of IBM and a denial of a motion for summary judgment in favor of Alpha. A district court's decision to grant summary judgment is reviewed *de novo*, whereas a district court's decision to deny summary judgment is reviewed for abuse of discretion. *Wojcik v. City of Romulus*, 257 F.3d 600, 608 (6th Cir. 2001). In this case, the differing standards of review are not dispositive to our resolution of the issues before us because the issues in this appeal are purely legal, contract interpretation. *See GenCorp Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 817-18 (6th Cir. 1999) (insurance contract). Inasmuch as a district court has no discretion to grant summary judgment on the basis of an incorrect interpretation of law, *see In re Brown*, 342 F.3d 620, 633 (6th Cir. 2003) (citation omitted), we review all the issues in this case *de novo*.

#### 2.    Analysis

To prevail on a breach of contract claim under Ohio law, a plaintiff must establish the following four elements: (1) the existence of a contract; (2) performance by the plaintiff; (3) a breach by the defendant; and (4) damage or loss to the plaintiff. *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio App. 1994). The district court granted summary judgment in favor of IBM and denied summary judgment in favor of Alpha on the ground that Alpha had failed to establish any entitlement to damages under the contract. Although we disagree with the district court's holding on damages, we

nonetheless affirm the order of the district court on the ground that Alpha failed to establish that IBM breached the contract in question.

### a.     Damages

The CSA expressly requires IBM to compensate Alpha for work completed under an SOW when IBM terminates a SOW without cause.  It states:

> In the event [IBM] terminates without Cause, [IBM] will compensate [Alpha] for the actual and reasonable  expenses incurred by [Alpha] for work in process up to and including the date of termination provided [Alpha] uses reasonable efforts to mitigate [IBM]'s liability under this Subsection by, among other actions, accepting the return of, returning to its suppliers, selling to others, or otherwise using the canceled Deliverables (including raw materials or work in process) and provided such expenses do not exceed the Prices.

(J.A. at 63).  Thus, Alpha is clearly entitled to be compensated for its work in the event of a breach.

The fact that Alpha's entitlement to payment under the SOW is conditioned on IBM's receipt of SLD funding does not render Alpha's right to damages in the event of breach conditional on such funding.  The district court's conclusion to the contrary, which is adopted by the concurrence, misconceives the nature of conditions precedent.  Conditions precedent render a party's performance conditional; conditions precedent do not grant a party the right to repudiate a contract prior to the occurrence of the condition.  *Corbin on Contracts* § 959 (interim ed. 2002) (discussing anticipatory repudiation).  When a party repudiates a contract before the occurrence of a condition precedent to the party's performance, the adverse party may "treat the entire contract as broken and sue for breach of contract, and there is no necessity in such cases for . . . compliance with conditions precedent." *Livi Steel, Inc. v. Bank One, Youngstown, N.A.*, 584 N.E.2d 1267, 1270 (Ohio App. 1989); *see also Corbin on Contracts* § 959 ("It is now the generally prevailing rule in both England and the United

States that a definite and unconditional repudiation of the contract by a party thereto, communicated to the other, is a breach of the contract, creating an immediate right of action and other legal effects, even though it takes place long before the time prescribed for the promised performance and before conditions specified in the promise have ever occurred"). In this case, Alpha argues that IBM repudiated the SOW prior to the occurrence of the relevant condition – SLD funding – and accordingly, Alpha need not establish that condition precedent contained in the SOW has occurred. *Id.* Although, as will be discussed in the next section, Alpha's contention that IBM repudiated the contract is incorrect, if IBM had repudiated the contract, the traditional principles of contract law espoused by Ohio would entitle Alpha to damages.

Similarly, IBM's argument that the *CSA itself* limits Alpha's recovery is incorrect. According to IBM, the CSA limits Alpha's right to recovery in the event of breach by limiting damages to the "Prices" set forth in the SOW. IBM interprets the SOW to set the "Price" at 0 in the event that IBM does not receive SLD funding. As IBM never received SLD funding, it contends that the CSA entitles Alpha's to "0" damages. The problem with IBM's argument, however, is that it confuses the concept of Price with the concept of right to payment. The prices set forth in the SOW are the actual numerical values attached to Alpha's work – in this case 7%-10% of various contracts – whereas SLD funding is a condition precedent to payment, not a part of the "Price."

To interpret "Price" otherwise would render the SOW termination clause set forth in the CSA meaningless. The CSA damages provision contemplates IBM terminating an SOW before the parties complete their performance under the contract, and conceivably before conditions precedent to payment are fulfilled. In fact, the entire purpose of the CSA damages provision is to compensate

parties in such cases. Thus, to hold that despite IBM's termination without cause, Alpha is not entitled to damages would be illogical.

### b. Breach

Nonetheless, Alpha is not entitled to damages under the CSA's damages provisions because IBM did not repudiate the SOW in issue. Alpha alleges that IBM's February 25, 2004 phone call, in which Mike Pratt instructed Alpha to stop work under the SOW, constituted an anticipatory repudiation of the terms of the SOW. At the time of the phone call, however, the SOW had already expired according to its own terms on December 1, 2003. The SOW reads:

### 1.5 Estimated Schedule

Alpha Telecommunications, Inc., will perform services in this Statement of Work as required to meet customer requirements. For this Statement of Work the Start Date will be December 1, 2001, and the *Termination Date shall be December 1, 2003.*

(J.A. at 18 (emphasis added).) Consequently, in February 2004, the SOW had already expired, and IBM could not have repudiated or terminated the SOW.

Alpha's contention that the SOW did not terminate of its own accord on December 1, 2003 because the termination deadline was extended is meritless. According to Alpha, the FCC's December 8, 2003 order altered the actual termination date by extending the regulatory funding year for E-Rate contracts ("project year"). As proof of its position, Alpha submits evidence that Alpha and IBM entered into another SOW, the Syracuse SOW, and the Syracuse SOW has not yet been terminated, ostensibly due to the FCC's order.

There are numerous problems with Alpha's argument. First, the FCC's alteration of its project year is irrelevant to the SOW's termination date. A project year is simply the year which a

school's plan must cover, and for which time period the FCC will supply a school with funding. Its dates do not correspond with any agreement between Alpha and IBM. As IBM correctly notes, the SOW does not state that its termination date is based on the FCC's project year, and Alpha fails to explain why the dates of the project year would have any bearing on the SOW's termination date. Notably, the original project year dates never matched the termination date, making any inference that the dates needed to correspond untenable. Second, the Syracuse SOW is not comparable to the SOW at issue in this case. The Syracuse SOW does not state a termination date. Therefore, to argue that because the Syracuse SOW has not terminated that this SOW has not terminated makes no sense. Finally, there is no relationship between the FCC's altered project year and the fact that Syracuse SOW has not yet terminated. The FCC's altered project year applied only to a limited number of school districts, those school districts covered by the SOW at issue in this case, but not those covered by the Syracuse SOW. *See In Re Request for Review of the Universal Service Administrator by Ysleta Independent School District,* 18 F.C.R. at 26407. Thus, the non-termination of the Syracuse SOW does not indicate that the FCC's order altered any termination date.

The only plausible argument that supports Alpha's position that the December 1, 2003 termination date was only an "estimated" termination date is the heading of the termination clause itself. The heading reads "Estimated Schedule." (J.A. at 18.) One could infer from the heading that the termination date itself, which was a part of the schedule, was also estimated.

Despite the plausibility of this interpretation, however, we nonetheless hold that the SOW expired on December 1, 2003. Assuming that the December 1, 2003 was an "estimate" and therefore subject to change, Alpha has offered this Court no reason to believe the date was actually

11

changed. As explained above, Alpha's theory that the FCC order altered the date is without merit. Inasmuch as Alpha offers no evidence that December 1, 2003 was not the termination date, there is no reason for this Court to assume that it was not.

**B.    Sanctions**

### 1.    Standard of Review

This Court reviews a district court order denying sanctions under Rule 11 for abuse of discretion. *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 833 (6th Cir. 2005). "A court necessarily abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

### 2.    Analysis

IBM filed a motion for sanctions alleging that Alpha violated Rule 11 by: (1) filing an objectively meritless complaint; (2) moving for summary judgment; and (3) selectively quoting passages from the contract to the district court. The district court denied the motion, finding Alpha's conduct was not objectively unreasonable because the SOW termination date was not clear from the face of the SOW. On appeal, IBM argues that the district court abused its discretion in denying the motion because, according to the plain language of both contracts, Alpha was not entitled to damages regardless of whether IBM terminated the agreement. Additionally, IBM argues that the district court abused its discretion in failing to consider that Alpha had selectively quoted from the contract.

Section (b) of Rule 11 prohibits attorneys from filing any "pleading, written motion, or other paper," unless "to the best of that attorney's knowledge, information, and belief, formed after an

inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed R. Civ. P. 11(b). In this Circuit, the test for whether sanctions under Rule 11 are warranted is whether the conduct for which sanctions are sought was "reasonable under the circumstances." *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997); *Runfola & Assoc., Inc. v. Spectrum II, Inc.*, 88 F.3d 368, 372 (6th Cir. 1996). The district court exercises wide discretion in determining whether an attorney's conduct is reasonable. *Id.*

The district court did not abuse its discretion in denying IBM's motion for sanctions pursuant to Rule 11. The termination date set forth in the SOW arguably was ambiguous. As discussed above, the clause's heading stated "Estimated Schedule," thereby allowing the inference that the termination date listed below was also estimated. Accordingly, the district court's determination that Alpha's position was not objectively unreasonable was within its discretion.

Furthermore, we decline to hold that IBM's remaining arguments merit a contrary result. First, IBM's primary argument – that the ambiguity of the termination clause is irrelevant because Alpha was not entitled to damages regardless of whether IBM terminated the contract – is incorrect as a matter of law as discussed in the previous section. Next, IBM's second argument – that Alpha selectively quoted passages – is waived. IBM failed to point to any specific instances in which Alpha selectively quoted passages. In addition to having a duty to develop arguments, *see United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1997), IBM has a duty to cite to the record in its brief on appeal, Fed. R. App. P. 28. Inasmuch as IBM has done neither with regard to its second

argument, we deem this argument waived. *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 366 (6th Cir. 1998); *Layne*, 192 F.3d at 566. Consequently, we hold that the district court did not abuse its discretion in denying IBM's motion for Rule 11 sanctions and affirm the district court's order.

## III.
## CONCLUSION

For the reasons set forth above, we **AFFIRM** the order of the district court.

GRIFFIN, Circuit Judge, concurring.

I concur in the result reached by the majority, but would do so for the reasons set forth by the district court. The district court found dispositive the section of the SOW entitled "Key Assumptions," and I agree. The relevant "Key Assumptions" provide:

> 2. This Statement of Work is contingent on funding confirmation from the Schools and Libraries Division (SLD) of the Universal Service Administrative Corporation. Funding confirmation shall occur when the SLD posts funding on the SLD website.
>
> 3. Alpha Telecommunications, Inc. will receive payment from IBM for services provided pursuant to the appropriate SOW . . . upon IBM [sic] receipt of payment from the federal government.

The district court interpreted these "Key Assumptions" as conditions precedent to the performance of IBM's payment obligations, and I find no reason to disturb that holding. Ohio law requires that "[a]n entire contract must be considered when determining whether a condition precedent exists." *Kaufman v. Byers*, 823 N.E.2d 530, 537 (Ohio App. 2004) (citations omitted). Generally, whether a particular provision is a condition precedent "is a question of intent; and the intention will be ascertained by considering the language not only of the particular provision, but of the whole contract and its subject-matter." *Id.* (citation omitted). Here, the SOW unambiguously provides that the SOW was contingent upon SLD funding, that Alpha was only entitled to payment after IBM's receipt of federal funds, and Alpha's payment (if any) was based on a percentage of the federal funds that IBM received.

Alpha's remaining arguments–that the FCC's ruling modified the time period of the SOW and that IBM breached the contract before the condition precedent could occur–are equally without merit. First, as IBM points out, the district court's grant of summary judgment was entirely based

15

on the failure of a condition precedent; therefore, it is irrelevant whether the FCC ruling extended the contract window. Most importantly, Alpha has not alleged that the condition precedent – that the school districts and, in turn, IBM, would receive federal funding – did occur, or would have occurred, within the extended time period. Notably, the applications for federal funding were submitted by the *school districts*, not IBM. Thus, even if Alpha were alleging a frustration-of-purpose defense to execution of the condition precedent, the school districts were responsible for submitting new bids, not IBM. To this effect, five of the school districts did submit new bids, yet, nevertheless, IBM did not receive any federal funds. Alpha has not alleged any evidence to the contrary, but merely contends that the CSA provision controls the contract's termination.

For these reasons, I would affirm the ruling of the district court with respect to Alpha's breach of contract claims. I join in Section II.B. of the majority opinion affirming the district court's order denying sanctions.