**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0368n.06

Nos. 08-4571 & 09-3125

**FILED**
**Jun 15, 2010**
LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

BANK ONE, N.A.,                                     )
                                                    )
    Plaintiff-Appellee,                            )      ON APPEAL FROM THE
                                                    )      UNITED STATES DISTRICT
    v.                                             )      COURT FOR THE SOUTHERN
                                                    )      DISTRICT OF OHIO
ECHO ACCEPTANCE CORPORATION; DISH                   )
NETWORK CORPORATION, f/k/a EchoStar                 )
Communications Corporation,                         )
                                                    )
    Defendants-Appellants.                         )
                                                    )

BEFORE:  GIBBONS and GRIFFIN, Circuit Judges; and DOWD, District Judge.[*]

    GRIFFIN, Circuit Judge.

    In this indemnity action, defendants Dish Network Corporation f/k/a EchoStar Communications Corporation ("ECC") and Echo Acceptance Corporation ("EAC") appeal the district court's (1) adverse judgment following a bench trial, (2) denial of their motion for summary judgment, and (3) award of $1,202,847.48 in attorneys' fees and costs to plaintiff Bank One, N.A. ("Bank One").  For the following reasons, we affirm the appealed rulings of the district court.

I.

_____

    [*]The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

ECC is a holding company for a group of telecommunications subsidiaries primarily engaged in selling satellite television equipment and programming to consumers. EAC and Dish Network Credit Corporation ("DNCC") are subsidiaries of ECC, which arranged for third-party lenders to provide financing to consumers purchasing satellite dishes. Bank One, a large national bank, was one such lender.

On August 24, 1994, Bank One and EAC entered into a Private Label Revolving Credit Plan Agreement (the "EAC Agreement") through which Bank One provided financing for defendants' satellite dish customers. Under the EAC Agreement, EAC sold home satellite dish equipment and offered its customers a Bank One credit card to help finance the purchase. The credit card bore the name of both Bank One and EAC and involved an open-ended financing plan.

Because EAC's sales force would make all sales exclusively, the EAC Agreement included a covenant by EAC that: "EAC and/or Dealers shall not coerce customers or pursue any deceptive practices in soliciting Accounts." This covenant was incorporated into the EAC Agreement's broad indemnification clause, which provided:

> EAC agrees to indemnify Bank One and to hold Bank One harmless from and against any and all actions, lawsuits, complaints, liabilities, losses, claims, damages and expenses (including, without limitation, reasonable fees and disbursements of counsel) suffered, sustained, incurred, paid or required to be paid by Bank One, whether filed or claimed by consumers or instrumentalities of the Federal or state governments, arising out of or resulting from (i) the breach, incorrectness, or incompleteness of any representation, warranty or covenant made by EAC in this Agreement or in any other instrument delivered pursuant hereto . . . .

Importantly, the EAC Agreement also contained a guarantee clause in which ECC, EAC's parent company, indicated it was "willing to act as the guarantor of EAC in order to induce Bank One to

enter into [the] Agreement[.]" Furthermore, the EAC Agreement gave EAC a "right to defend with counsel" against any third-party claim.[1] "Until [EAC] . . . assumed the defense of any such claim," it was required to pay for "all legal or other expense reasonably incurred by [Bank One in its defense.]"

In addition, ECC and Bank One entered into a separate Guarantee Contract in which ECC "absolutely and unconditionally" guaranteed EAC's promise of indemnity:

> [F]or the purpose of inducing Bank One . . . to make . . . financial accommodation to [EAC] ("Obligor") . . . , [ECC] hereby absolutely and unconditionally guarantees the prompt payment when due . . . of . . . all other sums payable in connection with, and the prompt performance of all promises, covenants and agreements contained in, any and all obligations of Obligor to Bank One, . . . and any and all renewals, modifications, extensions or substitutions thereof ("Obligations")[.]

On November 19, 1996, Bank One entered into a Private Label Revolving Credit Plan Agreement with DNCC (the "DNCC Agreement"), which was nearly identical to the EAC Agreement. As the district court stated in its factual findings:

> On paper, [ECC] then transferred the bulk of EAC's personnel, satellite dealers, and operating procedures to [DNCC] and ceased to conduct business through EAC. Although [DNCC] was, and continues to be, a separate legal entity from EAC, the change was nothing more than cosmetic. [ECC] wrote its dealers: "[t]his letter is to inform you that your Dealer Agreement signed with EAC . . . is invalid as of March 1996. **EAC has changed its name** to Dish Network Credit Corporation (Dish Network) and all paperwork must be signed under the new name."

---

[1]Moreover, § 23(C) of the EAC Agreement required that Bank One and EAC obtain the other's written consent before entering into any settlement agreement:

> Neither the indemnifying party nor the indemnified party shall settle or compromise any such third-party claim, action or proceeding without the prior written consent of the other which consent shall not be unreasonably withheld.

(Sixth, seventh, and eighth alterations in original.)  ECC and Bank One, however, did not execute a separate guarantee explicitly referencing the DNCC Agreement.

On March 3, 1998, plaintiff Martin Hunter filed a class action on behalf of approximately 72,000 credit card holders, roughly 58,000 of whom had bought satellite dishes from defendants and their dealers, against Bank One claiming that the dealers had misrepresented the terms and conditions of Bank One's financing plan to facilitate sales.  The *Hunter* plaintiffs did not name ECC or any of its subsidiaries as defendants in the lawsuit.  Instead, they proceeded against Bank One under the theory of respondeat superior.

Bank One, believing that the *Hunter* class action arose out of defendants' actions, including defendants' breach of their credit agreements' covenants prohibiting deceptive sales practices, contacted defendants by letter on the following four dates demanding indemnity and/or indicating that Bank One was pursuing settlement:  May 5, 1998, January 31, 2001, February 13, 2001, and March 27, 2001.  Although defendants acknowledged at least two of Bank One's letters, they did not oblige Bank One's requests for defense or indemnification.  On July 19, 2002, Bank One entered into a settlement agreement, without defendants' written consent, under which it promised to pay up to $26 million in cash and credit to class members, $8.5 million in attorneys' fees, and up to $300,000 in legal expenses.

Thereafter, Bank One filed the present action demanding indemnification for all costs and fees associated with the *Hunter* litigation and for attorneys' fees incurred in enforcing its alleged right to indemnification.  Defendants moved for summary judgment on the ground that the EAC

Agreement did not entitle Bank One to indemnification for the *Hunter* settlement. The district court

denied defendants' motion for summary judgment and, after a bench trial, awarded Bank One

$15,231,918, plus fees and expenses. In a subsequent order, dated January 12, 2009, the district

court granted Bank One's motion for attorneys' fees and costs incurred in the present case and

awarded Bank One $1,202,847.48. Defendants timely appeal.[2]

## II.

Following a bench trial, we review the district court's conclusions of law de novo and its

findings of fact for clear error. *Burzynski v. Cohen*, 264 F.3d 611, 616 (6th Cir. 2001). "When

factual findings rest upon credibility determinations, [we] afford[] great deference to the findings of

the district court." *Schroyer v. Frankel*, 197 F.3d 1170, 1173 (6th Cir. 1999); *see also* FED. R. CIV.

P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless

clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to

judge the witnesses' credibility."). Ohio law governs this breach-of-contract action.

## III.

EAC argues that Bank One failed to obtain its written consent to the *Hunter* settlement,

which, pursuant to the EAC Agreement, was a condition precedent to indemnification. Bank One

counters that EAC unlawfully repudiated its obligation to indemnify Bank One for *Hunter* and

consistently ignored Bank One's invitations to participate in settlement talks. Therefore, Bank One

[2]On April 10, 2009, the district court also granted Bank One's supplemental motion for attorneys' fees and costs, and awarded Bank One an additional $36,277.90. Although defendants originally appealed this order, we dismissed that appeal for want of prosecution.

contends it was not obligated to obtain EAC's written consent to the settlement agreement. The district court agreed with Bank One and held in its order denying defendants' motion for summary judgment: "By rejecting Bank One's request for indemnification, and consistently ignoring Bank One's invitations to participate in settlement negotiations, EAC forfeited its right to approve the settlement." Defendants challenge this ruling.

A.

As an initial matter, we must decide if the issue of repudiation, as it is presented in this case, poses a question of law or fact. The parties dispute whether the district court addressed the issue as a matter of law at the summary judgment stage, or treated it as an issue of fact that could only be decided after considering all of the evidence at trial. The distinction is critical for two reasons: (1) determining the appropriate standard of review, and (2) deciding whether defendants forfeited review of this issue on appeal by failing to raise it at trial.

1.

Whether a party to a contract has repudiated it, so as to commit an anticipatory breach, must be resolved by the trier of fact to the extent such a determination turns on disputed facts. *Farmers Comm'n Co. v. Burks*, 719 N.E.2d 980, 990 (Ohio Ct. App. 1998). However, if those facts are undisputed, whether a repudiation occurred is a question of law for the court. *Nuco Plastics, Inc. v. Universal Plastics, Inc.*, 601 N.E.2d 152, 155 (Ohio Ct. App. 1991); *see also Gronvall v. Petersen*, No. OT-88-55, 1989 WL 103346, at *2 (Ohio Ct. App. Sept. 8, 1989) (unpublished) ("[W]here the facts are undisputed, whether they constitute a . . . repudiation . . . is a question of law to be

determined by the court."). Here, the facts purportedly constituting repudiation – a series of letters between Bank One and defendants – are not in dispute. Accordingly, whether EAC repudiated the EAC Agreement is a question of law, which we review de novo. *McMullen v. Meijer, Inc*., 355 F.3d 485, 489 (6th Cir. 2004).

2.

Moreover, the repudiation issue was raised and argued at the summary judgment stage and was ultimately decided by the district court in its order denying defendants' motion for summary judgment. Therefore, defendants were not required to relitigate the issue by "present[ing] their [repudiation] evidence at trial and then argu[ing] th[e] issue in post-trial briefs" to preserve their right to appellate review. To be sure, typically, "where summary judgment is denied and the movant subsequently loses after a full trial on the merits, the denial of summary judgment may not be appealed." *Jarrett v. Epperly*, 896 F.2d 1013, 1016 (6th Cir. 1990) (footnote omitted).[3] However, "where the denial of summary judgment was based on a question of law rather than the presence of material disputed facts, the interests underlying the rule are not implicated." *U.S. ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc*., 400 F.3d 428, 441 (6th Cir. 2005); *see also Paschal v. Flagstar Bank*, 295 F.3d 565, 572 (6th Cir. 2002). In such cases, we may review the district court's denial of summary judgment, despite a trial on the merits, and in the absence of a

---

[3]We adopted the following rationale for the rule: "[W]e believe it would be even more unjust to deprive a party of a jury verdict after the evidence was fully presented, on the basis of an appellate court's review of whether the pleadings and affidavits at the time of the summary judgment motion demonstrated the need for a trial." *Jarrett*, 896 F.2d at 1016 n.1 (citation and internal quotation marks omitted).

post-judgment motion. *Medshares*, 400 F.3d at 441. This exception seems even more appropriate in the present case where the district judge was also the trier of fact.

B.

Under Ohio law, "[a] party repudiates a contract when the party insists upon terms contrary to the parties' agreement to the point where that insistence amounts to a statement of intention not to perform except on conditions which go beyond the contract." *Mihelich v. Active Plumbing Supply Co.*, No. 90965, 2009 WL 1351031, at *3 (Ohio Ct. App. May 14, 2009) (unpublished) (citation and internal quotation marks omitted); *see also Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 856 N.E.2d 1008, 1018 (Ohio Ct. App. 2006) (noting that the repudiation must be "unequivocal") (citation and internal quotation marks omitted). "When a party repudiates a contract before the occurrence of a condition precedent to the party's performance, the adverse party may 'treat the entire contract as broken and sue for breach of contract, and there is no necessity in such cases for . . . compliance with conditions precedent.'" *Alpha Telecomms., Inc. v. Int'l Bus. Machs. Corp.*, 194 F. App'x 385, 389 (6th Cir. 2006) (unpublished) (alteration in original) (quoting *Livi Steel, Inc. v. Bank One*, *Youngstown, N.A.*, 584 N.E.2d 1267, 1270 (Ohio Ct. App. 1989).

On May 5, 1998, approximately five weeks after being served with the *Hunter* complaint, Bank One wrote to defendants to advise of the filing of the *Hunter* case and to request indemnification. Bank One enclosed in its mailing copies of the *Hunter* complaint and the preliminary order of conditional class certification.

Defendants did not ask any questions about *Hunter* or request additional information. Instead, on June 10, 1998, defendants' lawyer, T. Wade Welch, sent a terse letter to Bank One denying its request for indemnification and declining to tender a defense:

> For various reasons, it does not appear that EAC owes Bank One either an obligation of defense or indemnity on the claims being made against Bank One in Tennessee. EAC declines to tender a defense to Bank One on the above referenced matter.

Notably, neither Welch nor defendants ever offered to describe or explain any of the "various reasons" supporting their decision.

Despite Welch's letter, Bank One tried repeatedly to engage defendants in discussions about indemnification. Three more times – on January 31, 2001, February 13, 2001, and March 27, 2001 – Bank One wrote to defendants to request indemnification, and it also informed them that it was pursuing settlement negotiations.[4] Defendants did not respond to Bank One's letters of January 31 and March 27, 2001. Although defendants responded to Bank One's February 13, 2001, letter, their purpose in doing so was merely to state that they purportedly had not received the January 31 letter that was referenced in the February 13 correspondence. Thereafter, Bank One's Vice President and Assistant General Counsel, Andrew Sutter, contacted EAC's Vice President and Associate General Counsel, Doron Gorshein, to discuss Bank One's indemnification demands. During their conversation, Gorshein allegedly expressed interest in meeting with Bank One to discuss the pending litigation and the *Hunter* case. However, when Bank One's outside counsel proceeded to make

---

[4]On June 12, 2001, Bank One wrote to defendants a fifth time and requested in more general terms that they meet to discuss the pending litigation.

arrangements for such a meeting in the summer of 2001, Gorshein allegedly "informed him that [ECC] was no longer interested in meeting."

As the district court correctly found, "[o]nce EAC rejected Bank One's initial demand for indemnification and repeatedly ignored its invitation to participate in the settlement process," it was not necessary for "Bank One to obtain EAC's written consent to the settlement agreement." Ohio law does not "require that an [indemnitee] notify its [indemnitor] of a proposed settlement after the [indemnitor] has already informed the [indemnitee] that [it] would not provide coverage pursuant to the [contract]." *Bakos v. Insura Prop. & Cas. Ins. Co.*, 709 N.E.2d 175, 181 (Ohio Ct. App. 1997).[5] By making "itself a stranger" to the *Hunter* action, *Nationwide Ins. Co. v. Baker*, No. CA90-04-062, 1991 WL 57106, at *6 (Ohio Ct. App. April 15, 1991) (unpublished per curiam) (internal quotation marks omitted), and "abandoning [Bank One] to [its] own devices in resolving the suit, [EAC] voluntarily [relinquished] the right to control the litigation and, consequently, will not be heard to complain concerning the resolution of the action in the absence of a showing of fraud . . . ." *Sanderson v. Ohio Edison Co.*, 635 N.E.2d 19, 23 (Ohio 1994); *see also Presrite Corp. v. Commercial Union Ins. Co.*, 680 N.E.2d 216, 220 (Ohio Ct. App. 1996) ("[W]hen the insurer denies

---

[5]Defendants argue that "insurance cases are inapposite where, as in this case, the party from whom indemnification is sought has no immediate or ongoing duty to defend." This argument fails for two reasons. First, an insurance policy and an indemnity agreement are analogous. *See Peterson v. TIG Specialty Ins. Co.*, 211 F. Supp. 2d 1013, 1017 (S.D. Ohio 2002) ("A policy of liability insurance is an indemnity agreement protecting the insured against liability to others."). Second, and more importantly, defendants' attempt to distinguish *Bakos* as involving a duty to defend is refuted by the *Bakos* opinion itself. There, the court stated: "[I]n the instant matter the issue is not Insura's duty to defend . . . ." *Bakos*, 709 N.E.2d at 181. Rather, as is the case here, the issue in *Bakos* involved a "refusal to provide coverage[.]" *Id.*

coverage and the insured is exposed to the entire amount of a potential damage award, the insured does not breach its duty to cooperate because it settles the case.").

Here, Bank One's May 5, 1998, letter, accompanied by the original *Hunter* complaint, fully and fairly notified defendants of their potential liability to Bank One for the underlying class action. Bank One's subsequent letters and telephone communications with defendants' counsel and executives informed them that Bank One was pursuing settlement negotiations and wanted them to participate. Because EAC rejected Bank One's request for indemnification in its June 10, 1998, letter, and refused Bank One's repeated invitations to engage in settlement negotiations, we affirm the district court's ruling that EAC repudiated the parties' contract and forfeited its right to approve the settlement.

C.

Alternatively, we hold that EAC's lack of consent to the *Hunter* settlement is ultimately irrelevant because the settlement was reasonable. Under the terms of the EAC Agreement, EAC could not withhold its consent to a reasonable settlement: "[C]onsent shall not be unreasonably withheld." Moreover, under Ohio law, "[i]f the consent-to-settle or other subrogation-related clause *was* breached, the second step is to determine whether the [] insurer was prejudiced." *Ferrando v. Auto-Owners Mut. Ins. Co.*, 781 N.E.2d 927, 947 (Ohio 2002); *see also Chalker v. Steiner*, No. 08 MA 137, 2009 WL 4755431, at *6 (Ohio Ct. App. Dec. 8, 2009) (unpublished) ("In *Ferrando*, the Ohio Supreme Court held that violations of notice or subrogation clauses do not preclude recovery

as a matter of law, but, instead, present a question of fact regarding whether the insureds acted reasonably and whether the insurance company was actually prejudiced.").

The district court made a factual finding that the *Hunter* settlement was "eminently reasonable . . . . a bargain[.]"  We review that finding for clear error.  *See Ornelas v. United States*, 517 U.S. 690, 694 n.3 (1996) ("'Clear error' is a term of art derived from Rule 52(a) of the Federal Rules of Civil Procedure, and applies when reviewing questions of fact."); *Atl. Mut. Ins. Co. v. Truck Ins. Exch.*, 797 F.2d 1288, 1297 (5th Cir. 1986) ("The reasonableness of the settlement is a question of fact, the determination of which we will not set aside unless clearly erroneous.") (internal citation omitted).  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

Defendants' sole argument of alleged prejudice is that, "had EAC been consulted" regarding the *Hunter* settlement, "EAC would not have blessed Bank One's agreement to pay class counsel $8.5 million in fees when the class itself only received $4.65 million."  However, defendants misrepresent the terms of the settlement agreement.  In exchange for a complete release in the *Hunter* litigation, Bank One agreed "to pay up to $26 million in cash and credit to class members, $8.5 million in attorney's fees, and $300,000 in legal expenses."  While Bank One ultimately paid approximately $5 million in cash and credit to class members, it strains belief to assume that Bank One knew it would settle *Hunter* for this amount.  As the district court accurately observed, it was "undisputed that most class members retained significant outstanding debt on their satellite-dish

purchases at the time of the *Hunter* settlement[,]" and "each of 72,000 class members had a strong monetary incentive to submit a claim."

Moreover, prior to *Hunter*, two satellite cases had been tried, which involved similar allegations of dealer fraud to those made in *Hunter*. In one case, a judge awarded thirty-three plaintiffs approximately $150 million. In the other, a jury awarded one family who had purchased two satellite dishes $581 million. *See Gantt v. Whirlpool Fin. Nat. Bank*, No. CIV. 99-470-AH-M, 2000 WL 1375298, at *1 (S.D. Ala. Aug. 22, 2002). Thus, if Bank One had tried *Hunter* before either a judge or a jury, these factually similar cases strongly suggested it could be liable for hundreds of millions of dollars. Indeed, with a class of 72,000 members, if each class member were awarded $10,000 (far less than the amounts awarded each plaintiff in the comparable cases), Bank One's exposure would be $720 million. The district court was therefore correct to conclude that the proposed *Hunter* settlement was "eminently reasonable . . . . a bargain[.]"

Because there is no evidence demonstrating that defendants were prejudiced by the settlement, we hold that the district court committed no error, clear or otherwise, in finding the *Hunter* settlement reasonable. Although Bank One failed to obtain defendants' written consent before entering into the *Hunter* settlement agreement, defendants were still required to indemnify Bank One.

IV.

Defendants next argue that Bank One was not entitled to indemnification under § 23(A) of the EAC Agreement because § 22, the fraud provision, prescribed Bank One's exclusive remedy

against EAC for claims of dealer fraud – chargeback. Moreover, because Bank One did not comply with the conditions precedent to recover under the fraud provision, defendants maintain Bank One cannot prevail on its claim. Alternatively, defendants contend that the existence of § 22 renders the EAC Agreement ambiguous and that this case should therefore be remanded to the district court for consideration of extrinsic evidence regarding the parties' intent.

"The question of whether the language of a written agreement is ambiguous is one of law[.]" *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (per curiam). *See also Boyer v. Douglas Components Corp.,* 986 F.2d 999, 1003 (6th Cir. 1993) (question of contract interpretation is subject to de novo review); *Reznick v. Provident Life & Accident Ins. Co.*, 181 F. App'x 531, 535 (6th Cir. 2006) (unpublished) ("We similarly find no clear error in the district court's application of its contractual interpretation as a factual matter."). "Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible [to] two or more reasonable interpretations." *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003) (citation and internal quotation marks omitted). "If a contract is clear and unambiguous, . . . there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term." *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio*, *Inc*., 474 N.E.2d 271, 272-73 (Ohio 1984) (internal citation omitted).

The fraud provision in § 22 of the EAC Agreement provides:

Bank One shall notify EAC of any fraud claim within three (3) business days of the date Bank One first becomes aware of the claim. If Bank One reasonably determines,

> based on a joint investigation with EAC, that a disputed Transaction is based on actual fraud, Bank One will require EAC to pay in cash or otherwise provide such amount sufficient to cover the Transaction within thirty (30) days. Bank One will not attempt to require EAC to purchase an Account based on fraud more than nine (9) months after initial activation of the Account.

Thus, the fraud provision requires EAC to purchase the account of any customer who seeks to be released from his credit plan based on an EAC's dealer's misrepresentations regarding financing. However, the relief afforded Bank One under the fraud provision is more limited than the remedies under the indemnification provision. In this regard, ECC's former president, James DeFranco, acknowledged that the fraud provision only covers the principal amount of a loan, not interest. Moreover, a chargeback does not include attorneys' fees, court costs, or any judgment rendered against Bank One in defending a lawsuit based on dealer fraud.

In contrast, the indemnity provision applies to "*any* and *all* actions, lawsuits . . . resulting from . . . the breach . . . of *any* . . . representation, warranty or covenant made by EAC . . . ."[6] (Emphasis added.) Consistent with EAC's covenant that "EAC and/or Dealers shall not . . . pursue *any* deceptive practices in soliciting Accounts[,]" (emphasis added), EAC agreed to indemnify Bank

---

[6]"[A]ny . . . has the force of 'every' or 'all.'" *Motor Cargo, Inc. v. Bd. of Twp. Trustees*, 117 N.E.2d 224, 227 (Ohio Ct. Com. Pl. 1953) (citation omitted). "[T]he use of the term 'all' in an indemnity clause has been interpreted to provide for the *broadest possible indemnification*[.]" *Perry Drug Stores v. NP Holding Corp.*, 243 F. App'x 989, 995 (6th Cir. 2007) (unpublished) (emphasis added) (citation and internal quotation marks omitted). Indeed, the Supreme Court of Ohio has stated that "[t]he word 'any' means . . . 'one that is selected *without restriction* or *limitation of choice* . . . .'" *Davis v. Davis*, 873 N.E.2d 1305, 1309 (Ohio 2007) (emphasis added) (citation omitted).

One for "*any* and *all . . .* lawsuits" filed against Bank One because of "*any* deceptive practices" by EAC's dealers.

There is no ambiguity caused by the fraud and indemnity provisions. It is immaterial that both sections of the EAC Agreement reference dealer fraud because each provision provides a distinct type of relief. Moreover, under Ohio law, a contract remedy is exclusive only if the parties so stipulate:

> But, although "[i]t is a basic principle of contract law that parties by an express agreement may contract for an exclusive remedy that limits their rights, duties and obligations," the parties must clearly indicate in the contract their intent "to make the stipulated remedy exclusive."

> Thus, where a "contract fails to expressly exclude the owner's common law remedies, or to limit plaintiff's remedies to those expressly stipulated in the contract," a party can still invoke independent remedies.

*Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 796 (6th Cir. 2003) (citations and footnote omitted) (alteration in original); *M.G.A., Inc. v. Amelia Station, Ltd.*, No. C-010606, 2002 WL 31127518, at *4 (Ohio Ct. App. Sept. 27, 2002) (unpublished) ("[L]imitations-of-remedies clauses are not favored and the parties' intent to make the specified remedy exclusive must be clear from all the facts and circumstances of the case."). Here, the fraud provision does not state it is the exclusive remedy for dealer fraud. Nor does the indemnity provision indicate it excludes dealer fraud.

Finally, although the fraud and indemnity provisions are not mutually exclusive, it is clear from the facts presented by both parties that the fraud provision of the EAC Agreement is not applicable to the present case. As the district court explained:

> Bank One is not demanding that EAC purchase the credit card accounts of 50,000 customers that it released from their contracts. That would implicate the Chargeback clause. Rather, Bank One is suing EAC for indemnification of the cost to settle a class-action lawsuit, money to which it is entitled to by the plain language of the Indemnification provision. To read the Chargeback clause as governing a claim for indemnification is to render the Indemnification provision moot. Indeed, that is nonsensical.

The district court's legal conclusions are correct, and its factual findings regarding the nature of Bank One's claim are not clearly erroneous. Therefore, we affirm the district court's ruling that Bank One was entitled to indemnification for the *Hunter* litigation based on the plain language of the EAC Agreement.

V.

Defendants next argue that they are not liable for the portion of the indemnification attributable to non-party DNCC because EAC and DNCC are separate corporations, and because ECC did not agree to guarantee DNCC's obligations to Bank One. The district court disagreed and held ECC liable for DNCC's conduct under two distinct theories: (1) ECC guaranteed the DNCC Agreement, and (2) the DNCC Agreement was "substituted" for the EAC Agreement within the meaning of ECC's Guarantee Contract. We agree with the district court that ECC guaranteed the DNCC Agreement, and we therefore do not decide whether the DNCC Agreement was "substituted" for the EAC Agreement within the meaning of ECC's Guarantee Contract.

On this issue, although the parties dispute the meaning of certain provisions within both the DNCC Agreement and ECC's Guarantee Contract, neither Bank One nor defendants maintain that the instruments are ambiguous. Accordingly, we defer to the express terms of the agreements and

interpret them according to their "plain and ordinary meaning." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995); *see also MidAm Bank v. Dolin*, No. L-04-1033, 2005 WL 1532622, at *8 (Ohio Ct. App. June 30, 2005) (unpublished) ("Guaranties are generally construed by courts in the same manner as contracts."). We review matters of contract interpretation de novo and any factual findings for clear error. *Boyer*, 986 F.2d at 1003.

The DNCC Agreement provides in relevant part:

WHEREAS, EchoStar Communications Corporation ("ECC"), located in Englewood, Colorado, is the parent of DNCC and is willing to act as the guarantor of DNCC in order to induce Bank One to enter into this Agreement[.]

In interpreting this language, the district court held that ECC "unconditionally guaranteed all of [DNCC's] obligations arising from [DNCC's] Credit Agreement with Bank One . . . ." As a result, it found ECC liable to Bank One for DNCC's contractual breach.

In their initial brief, defendants argue that the DNCC Agreement does not contain an enforceable guarantee, but rather, only an expression of ECC's willingness to act as DNCC's guarantor. As evidence of the correctness of their assertion, defendants note that ECC "similarly expressed its willingness to act as EAC's guarantor in . . . the EAC Agreement" but that the parties also executed a separate guarantee. And, because ECC did not execute a separate guarantee for DNCC, defendants contend ECC "cannot be tagged with DNCC's liability" based purely on the "WHEREAS" clause found in the DNCC Agreement.

Defendants fail, however, to cite any authority that parties must execute a separate guarantee contract to create an enforceable guarantee. They also identify no authority indicating that the

"WHEREAS" clause is insufficient to constitute a legally binding guarantee.[7] Moreover, ECC's

representation that it was "willing to act as the guarantor of DNCC *in order to induce Bank One to*

*enter into this Agreement*" demonstrates unambiguously that ECC guaranteed DNCC's obligations

once Bank One entered into the Agreement. (Emphasis added.) Indeed, parallel language contained

in other "WHEREAS" clauses in the DNCC Agreement confirms that the "willing to" language, as

used by the parties, imposed legally binding obligations upon the parties once the DNCC Agreement

was executed. For instance, the following statement immediately precedes the guarantee clause:

"WHEREAS, Bank One *is willing to* establish such a Plan subject to the terms and conditions set

forth herein[.]" (Emphasis added.) Neither party argues that this was merely an offer to negotiate

requiring a separate agreement for the DNCC Plan to become legally binding. In fact, both parties

behaved as if they had entered into, and were operating under, an enforceable contract. For these

reasons, we affirm the district court's determination that ECC "unconditionally guaranteed all of

[DNCC's] obligations arising from the subsidiary's Credit Agreement with Bank One[.]"[8]

---

[7]Defendants do not argue that the DNCC Agreement required that Bank One first attempt to recover from the principal debtor (DNCC) before proceeding against the guarantor (ECC). Moreover, we agree with the district court that the guarantee language is unconditional. Accordingly, Bank One was not required to pursue legal remedies against DNCC before filing a claim against ECC. *See N. Ohio Tractor, Inc. v. Richardson*, 456 N.E.2d 824, 827 (Ohio 1982) ("This language clearly indicates that appellants' liability is unconditional and absolute. Thus, appellee is not obligated to first proceed against R & W but may sue the guarantors without demand or legal proceeding against the principal debtor.").

[8]In their reply brief, defendants argue for the first time that "[b]ecause [ECC] never signed the DNCC Agreement, . . . [ECC] simply cannot be held liable for DNCC – period." A review of the DNCC Agreement confirms that DNCC and Bank One are the only signatories to the DNCC Agreement. However, because defendants did not properly raise this issue below, they are precluded

VI.

Finally, relying largely on the fee-shifting provision contained in the Guarantee Contract,

defendants argue that the district court erred by awarding Bank One its attorneys' fees and costs for

time spent litigating the merits of Bank One's indemnification claim.[9] Under Ohio law, contractual

---

from doing so now. *See Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1172 (6th Cir. 1996) ("Issues that are not squarely presented to the trial court are considered waived and may not be raised on appeal."); *see also Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1399 (6th Cir. 1995) ("[V]ague references fail to clearly present the objection in the district court so as to preserve the issue for appellate review."). Moreover, defendants forfeited our review of this issue by not raising it in their initial brief. *See United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006) ("[A]n appellant abandons all issues not raised and argued in its initial brief on appeal.") (citation and internal quotation marks omitted) (alteration in original).

Similarly, defendants have abandoned all issues regarding the arbitration clauses contained in both the DNCC and EAC credit agreements, as amended. In this appeal, defendants limit their discussion of arbitration to a single sentence. After stating that DNCC cannot be held liable as a non-party, defendants add: "That is especially true given that the DNCC Agreement contained an arbitration clause requiring any disputes between Bank One and DNCC to be resolved before the American Arbitration Association, not in court." Defendants do not discuss whether disputes between Bank One and ECC must be resolved before the American Arbitration Association, and there is no mention of the district court's ruling that they waived the issue of arbitration below. As such, to the extent defendants' single sentence can be considered an argument, we hold that they have presented it in such a perfunctory manner as to have forfeited it. *See Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 525 n.4 (6th Cir. 2006) (stating that an issue mentioned in a cursory manner in an appellate brief is forfeited); *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (alteration in original) (citation and internal quotation marks omitted).

[9]On appeal, defendants do not challenge the reasonableness of the attorneys' fees award. Indeed, in their response to Bank One's motion for attorneys' fees, defendants expressly did not object to Bank One's lodestar calculation. Further, Judge Marbley's opinion awarding attorneys' fees thoroughly analyzed the reasonableness of both the hours charged and the rate to be applied in the attorneys' fees calculation.

provisions requiring the payment of attorneys' fees are enforceable when "arrived at through free and understanding negotiation" and where both parties "were able to protect their respective interests." *Worth v. Aetna Cas. & Sur. Co.*, 513 N.E.2d 253, 258 (Ohio 1987); *see also Nottingdale Homeowners' Ass'n, Inc. v. Darby*, 514 N.E.2d 702, 705 (Ohio 1987). Although we generally "review a district court's award of attorney fees and costs for an abuse of discretion[,]" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008), we review "the validity and purpose of the contractual provision" providing for attorneys' fees de novo. *Graceland Fruit, Inc. v. KIC Chems., Inc.*, 320 F. App'x 323, 325 (6th Cir. 2008) (unpublished) (internal quotation marks and citations omitted).

Both the EAC and DNCC credit agreements contained fee-shifting provisions, which unambiguously obligated the defendants "to indemnify Bank One . . . from and against any and all . . . expenses (*including, without limitation, reasonable fees and disbursements of counsel*) . . . ." (Emphasis added.) Under Ohio law, these provisions entitled Bank One to recover not only its attorneys' fees in the underlying *Hunter* litigation, but also its attorneys' fees to enforce its indemnity rights in the present case. *Worth*, 513 N.E.2d at 257; *see also Motorist Ins. Cos. v. Shields*, No. 00CA26, 2001 WL 243285, at *5 (Ohio Ct. App. Jan. 29, 2001) (unpublished per curiam). And, because ECC unconditionally guaranteed both the EAC and DNCC credit agreements, it is equally liable for all of Bank One's attorneys' fees.

Defendants acknowledge that "the Ohio Supreme Court has held, in the insurance context, that a party suing to enforce an insurance indemnification contract is entitled to fees incurred in the

enforcement action[,]" citing *Allen v. Standard Oil Co.*, 443 N.E.2d 497, 500 (Ohio 1982). They

argue, however, that "[w]here as here, the contract at issue contains no duty to defend, . . . 'the

breach of a duty to pay costs does not automatically entitle' the indemnified party 'to a damage

award for the attorney fees incurred' in the enforcement action[,]" quoting *Pasco v. State Auto. Mut.*

*Ins. Co.*, No. 04AP-696, 2005 WL 1155901, at *4 (Ohio Ct. App. May 17, 2005) (unpublished).

Yet, in this case, defendants were not simply obligated to pay a judgment or an award of costs

against the insured. Instead, by choosing not to provide a defense to Bank One, defendants were also

required to pay "all legal or other expense reasonably incurred by [Bank One in bringing its own

defense.]" Thus, while defendants may not have had a duty to provide attorneys to defend Bank

One, they did have a duty to provide funds for the attorneys defending Bank One in the *Hunter*

litigation.

Regardless, the absence of a duty to defend is not fatal to Bank One's claim. As the Supreme

Court of Ohio explained in *Worth*:

> The underlying rationale of our decision in *Allen* was that where a party agrees to
> hold another harmless, the party seeking to enforce the terms of the indemnity
> agreement may be made whole by proceeding against the party who failed to abide
> by the terms of the agreement, and such recovery may include attorney fees.
>
> We can see no reason why an indemnity agreement which expressly allows for the
> recovery of attorney fees should be treated any differently from the indemnity
> agreement in *Allen* which did not expressly allow for the recovery of such expenses,
> but which was, nevertheless, held to allow for such recovery. In both cases, the
> indemnitor's alleged wrongful refusal to honor its obligations caused the indemnitee
> to incur legal expenses in order to vindicate its right to indemnity. Accordingly, we
> hold that an indemnitor's express agreement to indemnify an indemnitee for qualified
> legal expenses incurred is enforceable and is not contrary to Ohio's public policy.
> In the event that the indemnitor wrongfully refuses to honor its obligation, the

indemnitee may recover its legal expenses.

*Worth*, 513 N.E.2d at 242.

Here, defendants were contractually obligated to indemnify Bank One for any losses arising from dealer fraud. The EAC and DNCC credit agreements also required defendants to indemnify Bank One for any "reasonable fees and disbursements of counsel . . . paid by Bank One . . . arising out of or resulting from . . . the breach . . . of any . . . covenant made by [defendants] in [the credit agreements.]" Because defendants failed to abide by the terms of their agreements, Bank One incurred attorneys' fees and costs associated with the *Hunter* litigation and the present case. As such, Ohio law allows for Bank One to be made whole and recover its attorneys' fees. Accordingly, we affirm the district court's award of $1,202,847.48 in attorneys' fees and costs to Bank One.

VII.

For these reasons, we affirm the appealed rulings of the district court.